**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **UNITED STATES** *ex rel.* Patricia Lesko, | |
| Relator/Plaintiffs, | |
| v. | **No. 1:23-cv-02033-PAB** |
| **THE CLEVELAND INSTITUTE OF MUSIC and THE MUSICAL ARTS ASSOCIATION,** | **AMENDED COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

## I.  INTRODUCTION

1.      In 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 1102, 134 Stat. 286-294 (2020) (the "CARES Act"), to aid businesses struggling during the COVID-19 pandemic. The CARES Act included the Paycheck Protection Program ("PPP"), which enabled the federal government, through the Small Business Administration ("SBA"), to guarantee emergency loans to small businesses facing pandemic-related difficulties.

2.      As of January 8, 2021, the PPP had in its first round provided "5.2 million loans worth $525 billion to America's small businesses, supporting more than 51 million jobs," according to then-Treasury Secretary Steven T. Mnuchin.[1]

---

[1] Press release, *available at* https://home.treasury.gov/news/press-releases/sm1230. (All referenced websites were last accessed on April 18, 2025.)

3.      In early 2021, the government made additional money available for second loans for certain entities that had received initial loans. 15 U.S.C. § 636(a)(37). The government ultimately distributed some $800 billion in PPP loans, providing a lifeline to millions of small businesses and their employees.  But that distribution also attracted conduct that took illegal advantage of loan availability to the tune of an estimated $76 billion that went to entities ineligible for the loans, including the Defendants in this case, each of which is a nonprofit organization ("nonprofit").

4.      While generally not eligible for SBA programs, a nonprofit[2] was eligible to receive a first draw PPP covered loan under the CARES Act if, taking affiliation into account, the nonprofit (1) had no more than 500 employees in a single location and applied for loan forgiveness on or after March 11, 2021;[3] or (2) did not exceed the number-of-employees size standard established for its industry. 15 U.S.C. § 636(a)(36)(D)(iii)(I); 15 U.S.C. § 636(a)(36)(D)(i)(II); 15 U.S.C.  § 632(a)(5)(B); Paycheck Protection Program Loans FAQs ("PPP FAQs") Answer to Question 3.[4]

5.      To receive a "second draw" loan, a nonprofit had to meet three requirements. It had to employ no more than 300 employees in a single location, show a particular

---

[2] "Non-profit organization" is defined as "an organization that is described in section 501(c)(3) of title 26 and that is exempt from taxation under section 501(a) of title 26." 15 U.S.C. § 636(a)(36)(A)(vii).

[3] Applicants for loan forgiveness before March 11, 2021, had to have no more than a total of 500 employees regardless of the number of locations.

[4] https://www.sba.gov/document/support-faq-ppp-borrowers-lenders; note: the answer to Question 3 is essentially the same through all 26 versions.

reduction in gross receipts, and expend its first draw loan only for eligible expenses. 15 U.S.C. § 636(a)(37)(A)(iv).

6.     The PPP loans at issue here are two second draw loans, each for $2 million. The loans were later forgiven and, on information and belief, both were fraudulent, based on certified information previously provided to the government in their IRS Form 990s, and additional facts articulated in this Amended Complaint.  This information indicates that these nonprofits did not meet the applicable standards to be eligible for the PPP loans at issue.

7.      Relator brings this action on behalf of the United States and herself, against each of the Defendants for its conduct in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "FCA"). She seeks treble damages and statutory penalties arising from that illegal conduct.

8.     Confirming the federal government's approach to entities that received loans for which they were ineligible, Marc H. Silferman, the acting United States Attorney for the District of Connecticut, recently stated: "PPP loans were intended to help small businesses and their employees suffering the economic effects caused by the pandemic. This office is committed to pursuing those who violated the requirements of pandemic assistance programs and holding them accountable."[5]

9.     The goal of the PPP was to enable qualifying entities to retain employees, and the specific requirements for eligibility served to ensure those monies went to entities

---

[5]https://www.justice.gov/usao-ct/pr/waterbury-company-pays-more-22-million-resolve-false-claims-act-allegations-related-ppp

Congress intended to benefit. Accordingly, recouping PPP loan monies from the defendant nonprofits here will hold them accountable for claiming funds they were never entitled to have.

10.     The claims asserted in this Amended Complaint are based on the facts and information set forth below:

## II.     JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §3732(a), because this action is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, a federal statute.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)(2), because the Defendants can be found in, and transact or have transacted business in, this District.

13.     The original Complaint in this action was filed within the period prescribed by 31 U.S.C. § 3731(b), as was the Amended Complaint.

14.     There has been no public disclosure, relevant under 31 U.S.C. § 3730(e), of the "allegations or transactions" in this Amended Complaint. Relator makes the allegations in this Amended Complaint based on her own knowledge, experience, analysis, and observations. Alternatively, to the extent that any such public disclosure has been made, Relator is the original source of the information on which the allegations in this Amended Complaint are based because she possesses direct information that is independent of and materially adds to any allegations that may have been publicly disclosed. Finally, Relator

has voluntarily and in good faith provided this information to the federal government before filing this Amended Complaint.

## III.  PARTIES

### A.  Relator/Plaintiffs

15.     Relator brings this action on behalf of Plaintiff the United States. At all times relevant to this Amended Complaint, the United States, through the Small Business Administration, guaranteed loans provided to Defendants via the PPP. The United States also paid Defendants' lenders to forgive the loans.

16.     Relator Patricia Lesko is a resident of the State of Michigan. She is an award-winning independent investigative reporter who has worked to expose fraud and corruption for over 14 years.

### B.  Defendants

17.     The Cleveland Institute of Music is a 501(c)(3) not-for-profit educational institution, located in Cleveland, Ohio, that offers undergraduate and graduate programs. Founded in 1920 and registered as a nonprofit corporation in 1927, its registered agent is Brian Foss, and its registered office address is 11021 East Boulevard, Cleveland OH, 44106.

18.     The Musical Arts Association is a 501(c)(3) not-for-profit entity that operates the Cleveland Orchestra and is located in Cleveland, Ohio. Founded in 1915 and registered as a nonprofit corporation in 1925, its registered agent is James E. Menger and its registered office address is 11001 Euclid Ave., Cleveland, OH 44106.

## IV.    THE LEGAL FRAMEWORK

### A.    The False Claims Act

19.    The FCA, 31 U.S.C. §§ 3729 *et seq.*, establishes liability for any "person"

(natural or corporate) who, *inter alia*:

    a.  "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(l)(A);

    b.  "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(l)(B);

    c.  "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property," 31 U.S.C. § 3729(a)(1)(D); or

    d.  "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

20.    "Knowing" is defined by the FCA to include "deliberate ignorance of the

truth" or "reckless disregard of the truth." *Id*. § 3729(b)(1). No specific intent to defraud

need be shown. 31 U.S.C. § 3729(b)(1)(B).

21.    The FCA defines "claim" to include any request or demand for money that:

> is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
>
> (I)    provides or has provided any portion of the money or property requested or demanded; or
> (II)   will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded….

§ 3729(b)(2)(A)(ii).

22.    The term "obligation" in the FCA is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, …  relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." § 3729(b)(3).

23.    The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

24.    For each false claim or other FCA violation, the statute provides for the assessment of treble damages, plus a civil penalty. *Id*. § 3729(a)(1)(G).[6]

**B.    The CARES Act and the PPP**

**1)  Background**

25.    The CARES Act, *inter alia*, empowered the SBA to guarantee loans made by private lenders to eligible small businesses under the PPP.

26.    The PPP was "designed to provide a direct incentive for small businesses to keep their workers on payroll."[7] PPP loans were intended to help fund payroll costs,

---

[6] The amount of a civil penalty for conduct occurring after November 2, 2015, is based on the date of the assessment of the penalties. The current civil penalty for violating the FCA ranges from $13,946 to $27,894 for each false claim or statement. 28 C.F.R. § 85.5.

[7] https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan

including benefits; mortgage interest, rent, and utilities; and certain other costs of business operations.

27.     The Cares Act at §§ 1102 and 1106 (15 U.S.C. § 636(a)(36)[8]) added a new temporary "product" called the "Paycheck Protection Program," to the loan programs administered by the Small Business Administration ("SBA"). *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 F3d. Reg. 20,811 (April 15, 2020).[9]

28.     The PPP authorized forgivable loans to small businesses and organizations for payroll, mortgage interest, rent/lease, utilities, and other business-related expenses. 15 U.S.C. § 636(a)(36)(B), (F); 15 U.S.C. § 636m(b). The loans carried a fixed interest rate of 1%. 15 U.S.C. § 636(a)(36)(L).[10] The full principal amount of the loans plus interest could qualify for loan forgiveness. 15 U.S.C. § 636(a)(2) (F); 15 U.S.C. § 636(a)(36)(B); 15 U.S.C. § 636m(b),(c)(3).

29.     Private lenders, who were authorized to participate in the PPP, processed loan applications and funded approved loans using their own monies, which in turn were 100% guaranteed by the SBA. 15 U.S.C. § 636(a)(36)(B).

30.     Prior to passage of the Act, nonprofits had limited access to SBA loans. They were only eligible for microloans.[11]

---

[8] For ease of reference, subsequent citations to the Act shall be to the appropriate sections at 15 U.S.C. § 636(a).
[9] https://www.govinfo.gov/app/details/FR-2020-04-15/2020-07672
[10] https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan
[11] https://www.sba.gov/funding-programs/loans/microloans

31. The Act broadened nonprofits' access to SBA funds by making them eligible to receive forgivable loans under the PPP if they met the standards required for eligibility.

### 2) Standards for Nonprofits' Eligibility for PPP Loans

32. As stated above, the PPP offered what were called first draw loans during a "covered period," defined as "beginning on February 15, 2020, and ending on June 30, 2021." 15 U.S.C. § 636(a)(36)(A)(ii), (iii). The primary eligibility requirement for first draw loans was that the nonprofit had to employ 500 or fewer employees. With respect to who is counted as an employee, the PPP states: "the term 'employee' includes individuals employed on a full-time, part-time, or other basis." 15 U.S.C. 636(a)(D)(v). The methods and time frames for counting employees are further explained at 13 C.F.R. § 121.106, and in other PPP publications. *See e g.*, Paycheck Protection Program Loans FAQs ("PPP FAQs") Answers to Questions 3, 14, 36, 71.

33. In late December 2020, Congress enacted the "Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Pub. L. 116-260), which allowed certain entities to qualify for a second draw PPP loan.

34. As discussed above, a nonprofit that had already received a first draw loan could apply for a second draw loan for up to $2 million if it met three requirements based on employee size, reduction of gross receipts, and compliance with the requirements for its first draw loan.[12]

---

[12] https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan

35.     The statute modified the size standard for the second draw loan: to be eligible, the nonprofit could only have 300 or fewer employees in a single location. 15 U.S.C. § 636(a)(37)(A)(iv)(1)(aa) and (D). The directions for counting employees were the same as for first draw loans, except that entities could use their average number of employees in either calendar year 2019 or 2020.[13]

36.     A second requirement for a second draw loan, at issue here, was that the nonprofit was eligible only if it experienced a reduction of at least 25% in gross receipts in one quarter in 2020, compared to the same quarter in 2019. 15 U.S.C. § 636(a)(37)(A)(iv)(bb)(AA).

37.     For purposes of this requirement, "Gross receipts" are defined as "gross receipts within the meaning of section 6033 of title 26." 15 U.S.C. § 636(a)(37)(I)(ii). The IRS defines "gross receipts" for a nonprofit as "the total amounts the organization received from all sources during its annual accounting period, without subtracting any costs or expenses."[14]

38.      On  January 19, 2021 the SBA published a guidance document for entities applying for second draw loans. *See* "Second Draw Paycheck Protection Program (PPP) Loans: How to Calculate Revenue Reduction and Maximum Loan Amounts Including

---

[13] https://www.sba.gov/sites/default/files/2021-01/Second%20Draw%20PPP%20Loans%20--%20How%20to%20Calculate%20Revenue%20Reduction%20and%20Maximum%20Loan%20Amounts%20%281.19.2021%29-508.pdf at PDF 1

[14]    https://www.irs.gov/charities-non-profits/charitable-organizations/gross-receipts-test-section-501c3-exemption-application#:~:text=Gross%20receipts%20are%20the%20total,subtracting%20any%20costs%20or%20expenses

What Documentation to Provide" (Second Draw Guidance or Guidance)."[15]

39.     The Guidance defined "gross receipts" for nonprofits as the sum of certain lines in the IRS Form 990, discussed below, the total of which is provided in Item G[16] on the first page of the Form 990. Second Draw Guidance, Answer to Question 5.

40.     The Second Draw Guidance reiterated that a nonprofit could prove the required reduction based on a comparison of one quarter from 2020 compared to the same quarter in 2019. It also added an alternative: "Applicants may compare annual gross receipts in 2020 with annual gross receipts in 2019 if they were in business in 2019." *Id.* Answer to Question 3.

41.     To document the reduction, applicants could use a variety of documents including, for example, quarterly financial statements and bank statements. *Id.* Answer to Question 4. Annual income tax returns could be used to show an annual gross deduction, but only for applicants with fiscal year start dates on the first day of January, February, March or April. *Id.* at 8. That is entities with later fiscal year start dates would have to use documents other than an annual income tax return to prove the reduction comparing 2019 to 2020.

42.     The third requirement for receiving a second draw loan was that the nonprofit expended its first draw loan in full for authorized uses. 15 U.S.C. § 636(a)(37)(O).

---

[15]https://www.sba.gov/sites/default/files/2021-01/Second%20Draw%20PPP%20Loans%20--%20How%20to%20Calculate%20Revenue%20Reduction%20and%20Maximum%20Loan%20Amounts%20%281.19.2021%29-508.pdf
[16]https://www.irs.gov/pub/irs-prior/i990--2019.pdf at 10.

### 3)  PPP Loan Application and Certification Process

43.     To apply for a PPP loan, a qualifying nonprofit had to submit an SBA Form 2483 that all supporting documents and forms were "true and accurate in all material respects."  The certification further represented that the signer understood "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law."

44.     As the administrator of the PPP, the SBA authorized private lenders to receive, process, and approve loan applications. 15 U.S.C. § 636(a)(36)(F)(ii), (iii). These lenders were generally allowed to rely on a borrower's certifications and borrower-provided documents when determining eligibility for a loan, the amount of the loan and eligibility for loan forgiveness. 85 Fed. Reg. 20811, 20812 (April 15, 2020).

45.     The lenders processed the loan applications and issued any approval decision to the SBA with required loan data for SBA approval.

46.     After the SBA approved the loan, the lender then used its own funds to make the loans to the borrowers, but the SBA fully guaranteed the loans. 15 U.S.C. § 636(a)(36)(B).

47.     For second draw loans over $350,000 the fee amount paid to the lender for processing the loan was 3%.

48.     Similar to the first draw loan application, the nonprofit had to indicate in the Second Draw Borrower Application Form, the first section of which is copied below, the number of employees (the form explicitly said that the number "may not exceed 300"); the form then added a section requiring the nonprofit to indicate the quarter in 2020 when its

receipts were at least 25% less than the same quarter in 2019, and the amount of gross

receipts in those quarters.[17]

**Paycheck Protection Program**
**Second Draw Borrower Application Form**

OMB Control No.: 3245-0417
Expiration Date: 7/31/2021

| Check One: | ☐Sole Proprietor ☐Partnership ☐C-Corp ☐S-Corp ☐LLC ☐Independent Contractor ☐Self-Employed Individual ☐501(c)(3) nonprofit ☐501(c)(6) organization ☐501(c)(19) veterans organization ☐Housing cooperative ☐Tribal Business ☐Other | DBA or Tradename (if applicable) | Year of Establishment (if applicable) |
|---|---|---|---|
| | **Business Legal Name** | **NAICS Code** | |
| **Business Address (Street, City, State, Zip Code - No P.O. Box addresses allowed)** | | Business TIN (EIN, SSN) | Business Phone |
| | | Primary Contact | Email Address |

| Average Monthly Payroll: | $ | x 2.5 (or x 3.5 for NAICS 72 applicants) equals Loan Request Amount (may not exceed $2,000,000): | $ | Number of Employees (including affiliates, if applicable; may not exceed 300): | |
|---|---|---|---|---|---|
| Purpose of the loan (select all that apply): | ☐ Payroll Costs | ☐ Rent / Mortgage Interest | ☐ Utilities | ☐ Covered Operations Expenditures | |
| | ☐ Covered Property Damage | ☐ Covered Supplier Costs | ☐ Covered Worker Protection Expenditures | ☐ Other (explain): | |
| PPP First Draw SBA Loan Number: | | | | | |
| Reduction in Gross Receipts of at Least 25% (Applicants for loans of $150,000 or less may leave blank but must provide upon or before seeking loan forgiveness or upon SBA request): | 2020 Quarter (e.g., 2Q 2020): | | Reference Quarter (e.g., 2Q 2019): | | |
| | Gross Receipts: | $ | Gross Receipts | $ | |

49.     An authorized representative of the nonprofit seeking a second draw PPP

loan again had to certify, among other things, that the information provided in the

application and all supporting documents and forms was "true and accurate in all material

respects."  The certification further represented that the signer understood "that knowingly

---

[17]The section of the form included in this Amended Complaint was originally taken from the SBA website at https://www.sba.gov/document/sba-form-2483-sd-ppp-second-draw-borrower-application-form, Version 1. That page now says; "You are not authorized to access this page." However, the form continues to be available at https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program

making a false statement to obtain a guaranteed loan from SBA is punishable under the law."

### 4) PPP Loan Forgiveness and Certification Process

50.    Nonprofits were eligible for full forgiveness of their second draw PPP loans if, during an identified period following loan disbursement: (a) employee and compensation levels were maintained; and (b) loan proceeds were spent on payroll costs and other eligible expenses; with (c) at least 60% of the loan proceeds being spent on payroll costs.[18] 15 U.S.C. § 636(a)(37)(J); 15 U.S.C. § 636m(a)(4), (b), (d)(8).

51.    To apply for forgiveness, nonprofits had to submit a PPP Loan Forgiveness Application Form (SBA Form 3508) with supporting documents. [19] 15 U.S.C. § 636m(b).

52.    The amount of forgiveness requested could not exceed the principal amount of the covered loan the nonprofit received. 15 U.S.C. § 636m(d)(1). A reduction from the principal amount could occur under various circumstances, including, for example, a reduction in the number of employees. 15 U.S.C. § 636m(d)(2).

53.    As with the original loan application, a nonprofit had to certify that the information provided in support of the application "is true and correct in all material respects." The certification further acknowledged that making a false statement to obtain forgiveness could subject the applicant to imprisonment and/or fines.

54.    After a nonprofit submitted a Form 3508 for forgiveness, the lender had 60

---

[18] *See* https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness
[19]https://www.sba.gov/document/sba-form-3508-ppp-loan-forgiveness-application-instructions

days to approve or deny the application. 15 U.S.C. § U.S.C. § 636m(g). Upon approval, the SBA then had 90 days to make its forgiveness decision.

55.    If the loan was forgiven, the SBA remitted to the lender the full amount forgiven plus any interest accrued through the date of payment as reported on the lender's SBA Form 1502. 15 U.S.C. § 636m(c)(3).

56.    The PPP received three tranches of funding.[20] Congress initially appropriated $350 billion for the PPP loan program in the CARES Act on March 27, 2020. The loans were made on a first-come-first-served basis, and the initial amount was depleted within the program's first 13 days. An additional $320 billion was appropriated on April 24, 2020, through the Paycheck Protection Program and Health Care Enhancement Act. On December 27, 2020, a third tranche of $285 billion was appropriated as part of the Consolidated Appropriations Act of 2021. This third appropriation was intended for entities that had not taken out a prior PPP loan and to fund the second draw loans.

57.     The PPP application period ended on May 31, 2021, but the program ran out of money the first week of May, except that a small amount was available for a limited number of financial institutions.

58.    The SBA created a database providing detailed information on PPP loans, including information about the borrower, dates of receipt and forgiveness of funds,

---

[20] National Bureau of Economic Research, "The $800 Billion Paycheck Protection Program: Where Did the Money Go and Why Did It Go There?, January 2022, https://www.nber.org/system/files/working_papers/w29669/w29669.pdf at 4.

eligibility facts (e.g. business type, NAICS code, number of employees, payroll and other costs), lenders, and amounts loaned and forgiven.[21]

### C.    IRS Form 990

59.    While nonprofits are not required to pay taxes, the U.S. tax code requires tax-exempt organizations to file an IRS Form 990[22] every year:

> every organization exempt from taxation under section 501(a) shall file an annual return, stating specifically the items of gross income, receipts, and disbursements, and such other information for the purpose of carrying out the internal revenue laws as the Secretary may by forms or regulations prescribe, and shall keep such records, render under oath such statements, make such other returns, and comply with such rules and regulations as the Secretary may from time to time prescribe;

26 U.S.C. § 6033(a)(1).

60.    "Form 990 is the IRS' primary tool for gathering information about tax-exempt organizations, educating organizations about tax law requirements and promoting compliance."[23] The IRS further notes that nonprofits "also use the Form 990 to share information with the public about their programs."[24]

61.    Filing a Form 990 is more than a pro forma activity. If a nonprofit fails to timely file its Form 990, the statute imposes a penalty for each late day. For a nonprofit with gross receipts in excess of $1,208,500 the penalty is $120 per day, up to a maximum of $60,000. If a nonprofit fails to file for three consecutive years, it automatically loses its

---

[21]https://www.pandemicoversight.gov/data-interactive-tools/interactive-dashboards/paycheck-protection-program
[22]https://www.irs.gov/pub/irs-pdf/f990.pdf
[23] https://www.irs.gov/charities-non-profits/form-990-resources-and-tools
[24] *Id.*

tax-exempt status.[25] False statements in Forms 990 have also been the basis for legal action. *See e.g. U.S. v. Saffarinia*, 424 F. Supp. 3d 46, 62 (D.D.C. 2020) (finding false statements in Form 990 as basis for criminal conviction); *Campaign Legal Ctr. v. Fed. Election Comm'n*, No. CV 20-0809 (ABJ), 2021 WL 5178968, at *5 (D.D.C. Nov. 8, 2021) (finding Form 990 statements constitute evidence supporting allegations in default judgment action).

62.    The IRS further requires certification of Form 990s by "the current president, vice president, treasurer, assistant treasurer, chief accounting officer, or other corporate officer (such as a tax officer) who is authorized to sign as of the date this return is filed."[26] That signature certifies the following: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge." (Part II, Signature Block.)

63.    As pertinent for this case, the Defendants' Form 990s provide significant information about the second requirement for purposes of establishing eligibility for a second draw loan, a reduction of at least 25% in gross receipts in one quarter in 2020, compared to the same quarter in 2019 or a 25% reduction comparing 2020 to 2019. 15

---

[25] https://www.irs.gov/charities-non-profits/exempt-organizations-annual-reporting-requirements-filing-procedures-late-filing-of-annual-returns#:~:text=If%20an%20organization%20whose%20gross,day%20the%20return%20is%20late.

[26] https://www.irs.gov/pub/irs-pdf/i990.pdf at 10, "Part II. Signature Block."

U.S.C. § 636(a)(37)(A)(iv)(bb)(AA); Second Draw Guidance, Answer to question 3.

64.     Item G on the first page of the Form 990 provides the amount of "gross receipts" as defined by the IRS for the applicable fiscal year and required by the SBA and as defined by the IRS. As seen below, the same items constituting Item G also constitute gross receipts for SBA purposes.

| **Form 990** Instruction for completing Item G. Gross Receipts[27] | **SBA Second Draw Guidance**: Answer to Question 5,[28] What amounts do I use to calculate gross receipts? |
|---|---|
| Item G. Gross receipts. On Form 990, Part VIII, column A, add line 6b (both columns (i) and (ii)), line 7b (both columns (i) and (ii)), line 8b, line 9b, line 10b, and line 12, and enter the total here. | For nonprofit organizations (IRS Form 990): the sum of lines 6b(i), 6b(ii), 7b(i), 7b(ii), 8b, 9b, 10b, and 12 (column (A)) of Part VIII |
| Note: Gross receipts do not include any forgiven PPP or EIDL advances that are not subject to federal income tax. Second Draw Guidance, Answer to Question 2; *see* 15 U.S.C. 36m(i)(1) (PPP loans are not subject to federal income tax). | |

65.     The Defendants in this case have fiscal years that begin on July 1. In instances, like this, where a nonprofit's fiscal year for reporting gross receipts does not coincide with or come close to the calendar year, the amounts reported in the Form 990 will not provide a precise calculation of the reduction in gross receipts needed to be eligible for a second draw loan. However, a reasonable and probable conclusion about a reduction

---

[27]https://www.irs.gov/pub/irs-prior/i990--2020.pdf at 9
[28]https://www.sba.gov/sites/default/files/2021-01/Second%20Draw%20PPP%20Loans%20--%20How%20to%20Calculate%20Revenue%20Reduction%20and%20Maximum%20Loan%20Amounts%20%281.19.2021%29-508.pdf

in annual gross receipts can be drawn from a calculation based on averaging the gross receipts for FYE2019 and 2020 (representing Jan-June of 2019 and July-Dec. of 2019) and for FYE2020 and 2021 (representing Jan-June of 2020 and July-Dec. of 2020). A plausible conclusion can then be drawn whether a comparison of those numbers show a reduction in gross receipts for the two years involved and the extent of that reduction.

66.     In addition, a determination whether any reduction exists, or whether a reduction in the same quarters of 2019 and 2020 is plausible, can be made from the average numbers identified above, and from a comparison of the Gross receipts for the fiscal years 2019 and 2020, as well as a review of the consistency or pattern of gross receipts over several years.

67.     Finally, the overall financial condition of the entity provides a context within which to view the nonprofits' conduct. Accordingly, for each Defendant Relator provides additional financial information for the Defendants including total revenue (Part I, Line 12), revenue less expenses (Part I, Line 19), and net assets (Part I, Line 22) for fiscal years 2018 through 2022.

## VI.     FACTUAL ALLEGATIONS

68.     Relator is an experienced investigative journalist, senior editor, writer and publishing professional, with a graduate degree in creative writing from the University of Michigan, Ann Arbor.  For the past decade she has been the award-winning editor of "The Ann Arbor Independent."

69.     In the course of investigative reporting on the use of PPP loans by local entities, Relator became aware of anomalies that pointed to fraudulent abuses of

the program. Focusing on fraudulent loans received by nonprofits, she engaged in extensive collection and analysis of information from multiple sources.

70.    The facts below are based on Relator's research and analysis of the PPP loans applied for and received by the Defendants and then forgiven by the government along with research and analysis of other information pertinent to their eligibility to receive those forgiven loans.

71.    Each of the Defendants in this case

   i.    Applied, received, and had forgiven a first draw PPP loan, identifying itself as a 501(c)(3) entity, stating the number of its employees as 500 or fewer and certifying the information on the form as "true and accurate in all material respects."

  ii.    Applied, received, and had forgiven a second draw PPP loan of $2 million, certifying that it had fewer than 300 employees, had experienced a 25% reduction in gross revenue in one of the manners allowed, and had expended its first draw loan on authorized expenses.

 iii.    Caused the United States to reimburse a service fee for both of its loans to the Defendant's lender and, upon forgiveness, to reimburse the amount of the loan plus interest to the lender.

72.    The gross receipts of both Defendants reported in their Form 990s make it highly improbable that they actually experienced a 25% reduction in gross receipts in either the same quarter in 2020 compared to 2019, or the annual gross receipts of 2020 compared to 2019. This evidence makes it highly probable that they were ineligible for the second

draw loans they received, falsely represented that they were eligible, and ultimately kept those loans despite their ineligibility to have them.

73.     The requirements for eligibility were clear and these Defendants are sophisticated nonprofits with the resources to know what the requirements were and to follow them with the appropriate calculations.  Failure to do so, for this type of defendant can readily be shown to evidence deliberate ignorance or reckless disregard of the requirements.

74.     Defendants' misconduct was material to the Government's decision to provide and forgive the second draw loans they received. Meeting the eligibility requirements was a requisite to applying for and receiving the loans as well as for having the loans forgiven. The federal government has made it a priority to identify and charge entities both civilly and criminally who applied for, received and kept loans based on falsely representing their eligibility.

75.     Accordingly, the Defendants' fraudulent conduct caused the United States to be damaged in the amount of the service fee paid to the lender and the loan amount plus interest.

## A. The Cleveland Institute of Music

76.     The Cleveland Institute of Music ("Cleveland Institute") is a conservatory of music located in Cleveland, Ohio that offers undergraduate as well as preparatory and continuing education.

77.     The Cleveland Institute applied for and received a second draw PPP loan for $2 million that was loaned by Keybank National Association, which received a $60,000

service fee. The loan was later forgiven by the government and reimbursed, plus interest, to the Cleveland Institute's lender.

78.     Below are pertinent facts about The Cleveland Institute and its loan transaction:

| THE CLEVELAND INSTITUTE OF MUSIC (Second Draw Only)<br>PPP Loan Number: 5360338710<br>Basic Facts | |
|---|---|
| PPP loan amount requested for second draw | $2,000,000 |
| Date loan approved | April 21, 2021 |
| Service fee paid to lender | $60,000 |
| Date forgiveness approved | July 21, 2022 |
| Amount reimbursed to lender (loan + interest) | $2,023,507 |
| Total cost of loan (service fee, loan, interest) | $2,083,507 |
| Year founded | 1920 |

| Financial Information from Form 990[29] | | | | |
|---|---|---|---|---|
| FYE | Gross Receipts<br>Item G | Total Revenue<br>Line 12 | Revenue Less<br>Expenses<br>Line 19 | Net Assets<br>Line 22 |
| 6/30/18 | $74,580,749 | $32,916,611 | $2,326,138 | $73,545,433 |
| 6/30/19 | $42,765,454 | $29,187,747 | -$1,061,937 | $72,665,017 |
| 6/30/20 | $46,626,638 | $30,049,400 | $1,816,816 | $73,880,867 |
| 6/30/21 | $52,410,681 | $33,324,271 | $5,835,167 | $89,546,549 |
| 6/30/22 | $53,497,717 | $45,555,038 | $16,714,471 | $92,768,964 |

| % Differential between (Average of FYE 2019 and FYE 2020) and (Average of FYE 2020 and FYE 2021) | 2019 average: ($42,765,454 + 46,626,638)/2= **$44,696,046**<br>2020 average ($46,626,638 + 52,410,681)/2=**$49,518,659.50**<br><br>Using averages from the fiscal years, 2020 does not show a reduction in gross receipts from 2019; it shows an increase of **$4,822,613.50** or **11%.** |
|---|---|

---

[29] https://projects.propublica.org/nonprofits/search?q=cleveland+institute+of+music

| % Differential between Annual Gross Receipts for FYE 2019 and FYE 2020 | FYE 6/30/2020 ($46,626,638) does not show a reduction in gross receipts from FYE 6/30/2019 ($42,765,454); it shows an increase of **$3,861,184** or **9%** |
|---|---|

79.     In addition, looking at Defendant's gross receipts from July of 2019 through June of 2022, the variations do not show a pattern or likelihood of a dramatic reduction of 25% or more making it highly improbable that The Cleveland Institute will be able to identify the same quarters in 2019 and 2020 showing a *reduction* in gross receipts of 25% or more.

80.     The above facts and calculations demonstrate an extremely high probability that The Cleveland Institute did *not* experience a reduction in gross receipts of 25% or higher between calendar year 2019 and 2020 or between the same quarter in each of those years and therefore was ineligible for a second draw loan.

81.     The United States has been damaged by The Cleveland Institute's conduct in the amount of the processing fee, loan forgiveness, and interest paid to the lender: $2,083,507.

82.     The United States is also entitled to at least two separate civil penalties in an amount ranging from $13,946 to $27,894 for The Cleveland Institute's false statements related to its application for a second draw PPP loan and its application for forgiveness of that loan.

### B.     The Musical Arts Association ("MAA") (Second Draw)

83.     The Musical Arts Association is a non-profit organization that operates the Cleveland Orchestra. It is located in Cleveland, Ohio.

84.     The MAA applied for and received a second draw PPP loan for $2 million

that was loaned by Keybank National Association, which received a $60,000 service fee. The loan was later forgiven by the government and reimbursed, plus interest, to the MAA's lender.

85.    Below are pertinent facts about the MAA and its loan transaction:

| THE MUSICAL ARTS ASSOCIATION<br>PPP Loan Number: 3585498703<br>Basic Facts | |
|---|---|
| PPP loan amount requested for second draw | $2,000,000 |
| Date loan approved | March 31, 2021 |
| Service fee paid to lender | $60,000 |
| Date forgiveness approved | January 20, 2022 |
| Amount reimbursed to lender (loan + interest) | $2,015,288 |
| Total cost of loan (service fee, loan, interest) | $2,075,288 |
| Year founded | 1915 |

| Financial Information from Form 990[30] | | | | |
|---|---|---|---|---|
| FYE | Gross Receipts<br>Item G | Total Revenue<br>Line 12 | Revenue Less<br>Expenses Line 19 | Net Assets<br>Line 22 |
| 6/30/18 | $125,578,288 | $61,994,445 | $4,945,533 | $217,201,514 |
| 6/30/19 | $98,511,699 | $56,781,169 | -$1,207,246 | $211,490,514 |
| 6/30/20 | $125,719,256 | $54,210,898 | $1,960,834 | $195,704,084 |
| 6/30/21 | $90,378,693 | $69,418,564 | $27,538,349 | $288,001,504 |
| 6/30/22 | $97,821,411 | $62,138,155 | $5,104,540 | $256,972,481 |
| % Differential between (Average of FYE 2019 and FYE 2020) and (Average of FYE 2020 and FYE 2021) | ($98,511, 699 + 125,719,256)/2 = $112,115,477.50 ($125,719,256 + $90,378,693)/2 = $108,048,974.50. Using these numbers, there is a reduction of **$4,066,503**, or **4%**, between the 2019 and 2020 average gross receipts. | | | |
| % Differential between Annual Gross Receipts for FYE 2019 and FYE 2020 | FYE 6/30/2020 ($98,511,699) does not show a reduction in gross receipts from FYE 6/30/2019 ($125,719,256); it shows an increase of $27,207,557 or 28%. | | | |

---

[30] https://projects.propublica.org/nonprofits/organizations/340714468

86.     In addition, looking at Defendant's gross receipts from July of 2019 through June of 2022, the significant increase in gross receipts from July 1, 2019 June 30, 2020 point more to an increase or at most a modest reduction, making it highly improbable that The Cleveland Institute will be able to identify the same quarters in 2019 and 2020 showing a *reduction* in gross receipts of 25% or more.

87.     The above facts and calculations demonstrate a high probability that The Cleveland Institute did *not* experience a reduction in gross receipts of 25% or higher between calendar year 2019 and 2020 or between the same quarter in each of those years and therefore was ineligible for a second draw loan.

88.     The United States has been damaged by the MAA's conduct in the amount of the processing fee, loan forgiveness, and interest paid to the lender: $2,075,288.

89.     The United States is also entitled to at least two separate civil penalties in an amount ranging from $13,946 to $27,894 for the MAA's false statements related to its application for its second draw PPP loan and its application for forgiveness of that loan.

## VII.   CAUSES OF ACTION

90.     With respect to each Defendant and each count below, Relator re-alleges the allegations set forth in ¶¶ 1 through 16, and 19 through 75 as if fully set forth herein.

91.     With respect to Defendant The Cleveland Institute of Music, Relator also re-alleges the allegations at ¶ 17 and ¶¶ 76 through 82 as if fully set forth herein.

92.     With respect to Defendant The Musical Arts Association, Relator also re-alleges the allegations at ¶ 18 and ¶¶ 83 through 89 as if fully set forth herein.

93.     With respect to damages to the United States, they are identified with respect

to The Cleveland Institute of Music at ¶ 81 in the amount of $2,083,507 and with respect to The Musical Arts Association at ¶ 88 in the amount of $2,075,288.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT:
## <u>PRESENTATION OF FALSE CLAIMS</u>

94.     This is a claim for treble damages, statutory penalties, and other relief under the FCA.

95.     Through the acts described above and otherwise, Defendants, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the United States materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

96.     In addition, the United States was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

97.     The false or fraudulent claims Defendants knowingly submitted or caused to be submitted to the United States were material to the United States' decisions and legal authorization to make the payments requested.

98.     Regardless of whether each Defendant knowingly submitted fraudulent applications for PPP loans, the information available at the time they applied for forgiveness creates liability for knowingly retaining the loan monies or at least seeking forgiveness with reckless disregard of whether they were eligible to retain those monies through forgiveness.

99.     Had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making corresponding payments.

100.    Because of these false or fraudulent claims Defendants submitted or caused to be submitted, the United States has been damaged in an amount identified in ¶ 81 and ¶ 88 above, which amount is statutorily required to be trebled.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT:
## MAKING OR USING FALSE RECORD OR STATEMENT

101.    This is a claim for treble damages, statutory penalties, and other relief under the FCA.

102.    Through the acts described above and otherwise, Defendants, by and through their agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

103.    Defendants' false certifications and representations were made for the purpose of ensuring that the United States paid the false or fraudulent claims, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

104.    The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted and, because of the falsity of these records or statements, authorized payments to be made, made such payments, and has been damaged.

105.    The false records or statements Defendants knowingly made to the United

States were material to the United States' decisions to make the payments requested.

106.   Regardless of whether each Defendant knowingly submitted fraudulent applications for PPP loans, the information available at the time they applied for forgiveness creates liability for knowingly retaining the loan monies or at least seeking forgiveness with reckless disregard of whether they were eligible to retain those monies through forgiveness.

107.   Had the United States actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments.

108.   Because of these false records or statements, the United States paid claims resulting in damages to the United States in an amount identified in ¶ 81 and ¶ 88 above.

## COUNT III
## VIOLATION OF THE FALSE CLAIMS ACT:
## CONVERSION OF GOVERNMENT FUNDS

109.   This is a claim for treble damages, statutory penalties, and other relief under the FCA.

110.   Through the acts described above, each Defendant, with respect to the retention of and application for forgiveness for a second draft PPP loan for which it was not eligible, each Defendant had and has possession of federal money to be used for the Government's purposes and knowingly delivered, or caused to be delivered, none of that money to the government in violation of 31 U.S.C. § 3729(a)(1)(D).

111.   Regardless of whether each Defendant knowingly submitted fraudulent applications for PPP loans, the information available at the time they applied for

forgiveness creates liability for knowingly retaining the loan monies or at least seeking forgiveness with reckless disregard of whether they were eligible to retain those monies through forgiveness.

112.    The United States was damaged by each Defendant's fraudulent conduct in amounts identified in ¶ 81 and ¶ 88 above. It resulted in each Defendant's retention of money that belonged to the federal government in an amount to be determined at trial. That money was designated to serve the purposes of the CARES Act, the Paycheck Protection Program and Health Care Enhancement Act, and the Consolidated Appropriations Act of 2021. By seeking and accepting forgiveness of their PPP loans, the Defendants converted funds to their own purposes that were intended only for entities that were actually eligible for the forgivable loans.

**COUNT IV**
**VIOLATION OF THE FALSE CLAIMS ACT:**
**<u>AVOIDING OR DECREASING AN OBLIGATION TO PAY</u>**

113.    This is a claim for treble damages, statutory penalties, and other relief under the FCA.

114.    Through the acts described above and otherwise, Defendants, by and through their agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

115.    An "obligation" includes "an established duty, whether or not fixed, arising

from an express or implied contractual ... relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment," 31 U.S.C. § 3729(b)(3)."  79 Fed. Reg. 29,843, 29,918 (May 23, 2014).

116.    The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted.

117.    Defendants knowingly made false and fraudulent representations and claims to the United States that were material and deprived the United States of money Defendants were obligated to repay to the United States.

118.    Regardless of whether each Defendant knowingly submitted fraudulent applications for PPP loans, the information available at the time they applied for forgiveness creates liability for knowingly retaining the loan monies or at least seeking forgiveness with reckless disregard of whether they were eligible to retain those monies through forgiveness.

119.    By knowing they had received and retained forgivable loan monies in a fixed amount to which they were not entitled, yet failing to self-disclose the misconduct to the United States or to refund the loan, Defendants violated 31 U.S.C. § 3729(a)(1)(G).

120.    Because of these conduct, the United States has been damaged in an amount identified in ¶ 81 and ¶ 88 above, which amount is statutorily required to be trebled.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Relator respectfully requests that this Court enter judgment in her favor and that of the United States and against Defendants, granting the following on all Counts:

A. Judgment against each Defendant and in favor of the United States, in an amount equal to the damages the United States has sustained due to each Defendant's actions, trebled, plus a civil penalty for each violation of 31 U.S.C. § 3729(a)(l)(A) and (B), pursuant to 31 U.S.C. § 3729(a), as adjusted by operation of the federal Civil Penalties Inflation Adjustment Act of 1990;

B. The maximum award to Relator allowed, along with her attorney fees and expenses and other costs of this action, pursuant to 31 U.S.C. § 3730(d); and

C. Awards to the United States and Relator for pre- and post-judgment interest at the rates permitted by law; and

D. Such other and further relief as this Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by the Amended Complaint.

Dated:  April 21, 2025,                Respectfully submitted,

 /s/ Susan M. Coler
Susan M. Coler, MN No. 217621
admitted *pro hac vice*
HALUNEN LAW
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099
coler@halunenlaw.com

*ATTORNEY FOR RELATOR*